## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

JOSE G. RAMÍREZ, JR.,

Defendants.

CIVIL NO. 15-2365 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

The Securities and Exchange Commission ("SEC") initiated this action against José G. Ramírez, Jr., alleging that he violated Sections 17(a)(1)-(3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77q(a)(1)-(3), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c), by way of a fraudulent scheme involving material omissions and misrepresentations to customers in order to purchase and sell approximately $50 Million in closed-end funds (Docket No. 1 at ¶¶ 1, 4). Before the court is SEC's "Motion for Partial Summary Judgment on the Issue of Liability and Accompanying Memorandum of Law" (Docket Nos. 21 and 22). Ramírez opposed and filed a "Motion to Strike" (Docket Nos. 29-31). The SEC replied (Docket No. 34). Because there is ample evidence of Ramírez's liability, the SEC's motion is GRANTED.

## I.    BACKGROUND

Ramírez was a registered representative of UBS Financial Services Inc. of Puerto Rico ("UBS-PR")(Docket No. 1 at ¶ 7). The SEC claims that from approximately 2006 through

approximately 2013, Ramírez made material omissions and misrepresentations to customers and effected a fraudulent scheme that increased his compensation by soliciting customers to improperly use proceeds from lines of credit offered by a UBS-PR affiliate in order to purchase securities. Id. at ¶¶ 1, 3. This, despite the fact that he knew UBS-PR's policy and the line of credit agreements prohibited customers from using loan proceeds to purchase securities. Id. at ¶ 2.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is need for trial. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004). All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013). Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported summary judgment motion. Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013)(citing Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir.2001))(internal quotation marks omitted).

## III.  FINDINGS OF FACTS[1]

### A.  Background

Ramírez was a registered representative of UBS-PR from approximately 1997 until 2014 (Docket No. 22-1, "Plaintiff's Statement of Material Uncontested Facts in Support of Plaintiff's Partial Motion for Summary Judgment on the Issue of Liability" ("SUMF") at ¶ 1).  See also Docket No. 30, defendant's "Counterstatement of Material Facts" ("OSUMF" at ¶ 1).[2]  While at UBS-PR, he was a proponent of UBS-PR's closed-end funds ("CEFs").[3]  He was the registered representative of record for approximately 350 customer accounts, most if not all of which held shares of CEFs.  SUMF at ¶ 2.[4]  He favored CEFs because they offered an attractive yield, advantageous reinvestment options, and tax advantages to customers.  SUMF at ¶ 3.[5]  CEFs paid

---

[1] As statements of fact, plaintiff submitted 37 numbered paragraphs.  While Local Rule 56(b) requires a motion for summary judgment to be supported by "*separate, short, and concise* statement of material facts," L.Civ.R. 56(b)(emphasis added), some of the SEC's paragraphs were somewhat extensive and included more than one issue of fact.  Even though the court reviewed every statement submitted by the parties, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed.R.Civ.P. 56.

[2] Ramírez opposed summary judgment via a "Motion to Strike" (Docket No. 29) and an "Opposition to Motion for Partial Summary Judgment" (Docket No. 31) with an accompanying "Counterstatement of Material Facts" (Docket No. 30).  The "Motion to Strike" states that most of the SEC's exhibits are inadmissible, and as such the court should strike them from the record and deny the motion for summary judgment.  These arguments are analyzed and mostly rejected in Section IVB.  The "Opposition to Motion for Partial Summary Judgment" and "Counterstatement of Material Facts" reiterate the inadmissibility of the SEC's documents, arguing that the SEC's SUMFs should be deemed denied, without more, because of Ramírez's assertion of Fifth Amendment rights.  This argument is considered and rejected in Section IVA.  Defendant did not attempt to controvert any of the SEC's SUMFs by presenting evidence.

[3] Ramírez contends this statement is not properly supported.  OSUMF at ¶ 2.  Vanessa Ortiz testified that Ramírez focused on promoting Puerto Rico CEFs "for everybody" and as one of the "two big areas for him" (Docket No. 22-5 at p. 40, lines 7-14).  That Ramírez also "focused" on bonds does not make the fact that he was a proponent of CEFs any less true.  Moreover, he testified to that, when he stated that UBS closed-end funds were "a big product for me" (Docket No. 22-6 at p. 46, lines 18-22).

[4] Ramírez argues that the last sentence of the SEC's SUMF at ¶ 2 to the effect that all of his accounts held shares of closed-end funds is exclusively supported by his assertion of the Fifth Amendment privilege, making it legally insufficient.  OSUMF at ¶ 2.  The argument lacks merit.  Although the SEC supported the statement with Ramírez's testimony, it is testimony in connection with which the privilege was not raised.  Upon being asked how many clients he had in his books when he left UBS, Ramírez answered "350, around 350 accounts" and after being asked how many of those clients had closed-end funds, Ramírez answered "around 350" (Docket No. 22-6, p. 47, lines 2-5).

[5] As described in the Complaint, CEF's are closed-end investment management companies incorporated under the laws of Puerto Rico, available only to Puerto Rico residents (Docket No. 1 at ¶ 19).  They are non-marginable; are not registered in the SEC; are not traded on any exchange or quoted on any quotation service (id.); and are significantly leveraged, financing approximately 50% of their total assets, thus bearing the concomitant risk level.  Id. at ¶ 20.  Nearly all of them invest in similar securities, with investment portfolios generally concentrated in Puerto Rico municipal bonds, which produce tax-free interest income.  Id.  Dividend

brokers a 3% commission at the initial offering.  SUMF at ¶ 4.[6]  Even though investing in CEFs had risks such as lack of liquidity and of off-island diversification, SUMF at ¶ 5,[7] Ramírez did not explain those risks to clients (id.),[8] some of whom even believed, erroneously, that the CEFs were bonds.  SUMF at ¶ 6.

## B.  Lines of Credit

UBS-PR offered its customers non-purpose lines of credit ("LOCs") from a Utah-based affiliate, UBS Bank USA ("UBS-USA"), at no initial cost to the customer and a low interest rate. SUMF at ¶ 7.[9]  Registered representatives received additional compensation based on the amount drawn on customers' LOCs.  SUMF at ¶ 9.[10]  Nonetheless, UBS-USA's loan agreements and UBS-PR's internal policy prohibited the use of LOC proceeds to purchase, carry, or trade in securities.

---

payments to residents of Puerto Rico are tax-exempt.  Id.  To be eligible for tax benefits, CEF's portfolios must be comprised of at least 67% in Puerto Rico issuers.  Id.  Although CEF's have a high percentage of their portfolios in Puerto Rico bonds, they are not fixed-income securities.  Id. at ¶ 21.  Payable dividends vary depending on a number of factors, including prevailing variable margin loan rates payable by the particular CEF, interest rates, the market value of securities within the CEF's and various fees and expenses.  Id.  In response to this description, Ramírez invoked his constitutional right against self-incrimination.  See, Docket No. 8 at ¶¶ 19, 20, 21.

[6] As submitted by the SEC, this SUMF initially read: "CEFs paid brokers a 3% commission making them the highest paying securities registered representatives could sell."  Upon defendant's objection (OSUMF at ¶ 4) and the SEC's response (Docket No. 5, p. 9), the court has modified it to reflect the referenced testimony more appropriately.  Either way, as the SEC suggests, whether the CEFs were the highest commission paying securities is not an issue of material fact.  And the fact that Ramírez received commissions, which is material, is established by the court's modification.

[7] Ramírez posits that the fact that CEFs "had risks, such as the lack of liquidity and lack off-island diversification" is exclusively supported by his assertion of privilege during his deposition, but defendant did *not* claim the Fifth Amendment privilege in the testimony that the SEC referenced in support of that item (Docket No. 22-6 at p. 50-51; Docket No. 34 at p. 10).

[8] Ramírez maintains that this fact is not supported by Vanessa Ortiz's testimony.  Ortiz stated that Ramírez "didn't talk a lot about risks . . . And he would talk about fluctuations, normal fluctuations, but never using principal in large amounts or never the type of risk assessments . . . He would talk about the good features of the bonds first and then of the funds later on.  But never went into risk disclosure of you might lose everything.  Never heard that from him" (Docket No. 22-5 at p. 36, lines 3-15).  The testimony supports the fact to which it is linked.

[9] Ramírez claims the fact that UBS-PR offered LOCs from UBS-USA and at a low interest is not supported by the referenced documents (OSUMF at ¶ 7).  Exhibit 9 is a Credit Line Account Application that bears the name UBS Bank USA on every page, discusses interest terms, and states "All decisions made by bank regarding the credit line will be made in Utah (Docket No. 22-10)."  This is sufficient to establish that LOCs were provided from the Utah-based affiliate (Docket No. 34 at p. 10).

[10] The court modified the SEC's proposed SUMF, as it could not ascertain where the supporting documents established that the registered representatives also received "credit for new assets when an LOC is opened."

SUMF at ¶ 7.[11]   See also SUMF at ¶ 11.   UBS-PR's internal policy required registered representatives to take reasonable steps to ensure customers understood the risks associated with taking an LOC, SUMF at ¶ 8,[12] which included making sure the customers understood the risks they faced in the event their collateral became insufficient due to market declines.   Id.   In those circumstances, the customer could be required to increase collateral, repay the borrowed funds, and/or sell securities.   Id.[13]

Each application for a LOC contained a "UBS Bank USA Know Your Customer: Appropriateness and Client Verification" form.   SUMF at ¶ 12.   By singing the form, the registered representative represented that he had explained to the customer that: (1) BUSA could demand repayment of the loan at any time; and (2) if the value of the pledge collateral fell below BUSA's maintenance requirements, BUSA could require the customer to deposit additional collateral and/or sell the pledged collateral to repay the loan.   Id.[14]

---

[11] The court notes that the SEC has not specified pages or paragraphs in some of the referenced documents.  For example, in support of the third sentence of SUMF at ¶ 7, the SEC included "Ex. 9, LOC Application…" yet did not point to a specific page or paragraph, which forced the court to devote additional time and effort to find the information.  See Docket No. 22-10 at p. 5, ¶ 7 and p. 7, ¶ 7; Docket No. 22-15 at pp. 1, 5.

[12] In support of SUMF at ¶ 8, the SEC references "Ex. 14 Credit Line Compliance Policy" but points to no particular page or section of that document.  Upon review, the court located the cited material at p. 3, ¶ 2 of Exhibit 14 (Docket No. 22-15).

[13] In opposition of SUMF at ¶ 8, Ramírez merely states "[d]enied for the same reasons as the preceding paragraph."   The previous paragraph was denied for various reasons and in different contexts, so the court is unclear as to what Ramírez is referring to.  Hence, the denial is deemed waived.  See, U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").

[14] In support of SUMF at ¶ 12, the SEC references Exhibit 19.  However, it points to no particular page or section of that document.  Upon review, the court found the materials referenced at p. 15 at ¶ 2 of Exhibit 19 (Docket No. 22-20).

### C. Ramírez's Scheme

Ramírez was aware that UBS-PR policy did not allow customers to use LOC proceeds to purchase securities, and that UBS-USA's LOC loan agreement prohibited it. SUMF at ¶ 10.[15] Despite those prohibitions, he presented customers a way to make additional money by using LOCs to increase their CEF holdings, recommending the strategy of using proceeds from LOCs to purchase CEFs since at least 2006. SUMF at ¶15. Customers could borrow money through the LOC at rates as low as 1.5 percent, with the CEFs generating returns of greater than 6 percent. SUMF at ¶ 16. So in some instances, Ramírez would call customers over the telephone to request that they sign the LOC documentation. SUMF at ¶ 14.

In order to circumvent UBS-PR's policy against using LOCs to purchase securities, Ramírez directed his customers to request wire transfers or write checks from their LOCs to the customers' personal bank accounts in other banks. SUMF at ¶ 17. Afterwards, customers were instructed, to deposit the funds recently deposited in their outside bank accounts, into their UPS-PR brokerage accounts, to allow Ramírez to execute trades for additional CEF shares. SUMF at ¶¶ 17 and 22. The scheme avoided detection because UBS-PR did not have a procedure designed to catch transfers from LOCs to outside banks and from outside banks back to UBS-PR. SUMF at ¶ 18.

### D. Ramírez's Material Representations and Omissions

Ramírez misrepresented to customers that there was no violation of UBS-PR policy as long as the proceeds were first transferred to an outside bank account. Id. In several meetings with customers, he would take a dollar bill out of his wallet and say "if I give you this dollar and you

---

[15] Exhibit 18 submitted by the SEC in support of SUMF at ¶ 10 includes a "Know Your Customer Form," signed by Ramírez at p. 13, stating that a non-purpose loan "may not be used (directly or indirectly) to purchase or carry securities."

bring [another dollar] back next month, it's not the same dollar." SUMF at ¶¶ 20, 25. He told some customers "Plaza las Americas will go broke before something happens [to your money]," SUMF at ¶ 25;[16] stated that there was little or no risk in using proceeds from their LOCs to reinvest in additional shares of the CEFs; and falsely claimed that investments in the CEFs were guaranteed by the Constitution of Puerto Rico, SUMF ¶ 24.

Additionally, Ramírez did not explain to his customers that if the value of the collateral decreased below a certain level, the customer could receive a maintenance call, and the firm could liquidate the customer's investments in order to satisfy the outstanding maintenance call. SUMF at ¶ 13.[17] Had the customers known the risks involved in this scheme, and that doing so was against UBS-PR policy and a violation of the LOC loan agreement, they would have not invested in CEFs using LOC proceeds. SUMF ¶ 25. He misrepresented to UBS-PR on the "Know Your Customer" form that he had disclosed material information concerning risks to the customers. SUMF ¶ 25.[18]

### E. Ramírez's Reward

Ramírez was a top performing registered representative at UBS-PR with regard to LOC business production. SUMF at ¶ 27. He received recognition as a "Banking Champion." Id. His

---

[16] Plaza Las Américas is a well-known shopping center located in the City of San Juan, Puerto Rico, open to the public since 1968. See, http://www.plazalasamericas.com/center-info/about-us/

[17] UBS-PR and BUSA operated a "haircut engine," which considered the value of the collateral and the outstanding balance of the LOC account. SUMF at ¶ 8. If the value fell below a certain threshold determined by the engine, the customers received a maintenance call requiring them to increase the collateral, pay down the loan by a certain amount, or risk UBS' liquidating collateral. Id. Since the CEFs were not marginable, customers could not use them to obtain margin loans. SUMF at ¶ 15.

[18] In support of this particular fact, the SEC references Exhibit 18 yet points to no particular page or section in the document for support. Upon review, the court finds the relevant materials at pp. 11-13 of Exhibit 18 (Docket No. 22-19). That document, which Ramírez signed, states that the following had been explained to the clients: "the proceeds of the Loan may not be used (directly or indirectly) to purchase or carry securities…" and that if "the value of the pledged collateral falls below the Bank's maintenance requirements, the Bank may require the client to deposit additional collateral and/or sell the pledged collateral to repay the Loan" (Docket No. 22-19 at p. 1, ¶ 1).

compensation was based, in part, on his LOC production and the amount of funds his customers withdrew upon their LOCs. SUMF at ¶ 28. He earned commissions on the CEFs his customers purchased, id., and from 2011-2013, he received over $12.9 Million in total compensation, over $5.5 Million of which was attributable to customer LOCs. Id.

### F. Collapse of the CEF Market

In 2013, the Puerto Rico bond market collapsed when, among other things, major credit ratings agencies began a series of downgrades of Puerto Rico's credit rating. SUMF at ¶ 29. The erosion in the Puerto Rico bond prices hit CEF investors particularly hard because the CEFs employed leverage of up to 50 percent of the total CEF assets, losing 20-30% of market capitalization. SUMF at ¶ 30. And so, customers with LOCs collateralized by brokerage accounts holding CEFs began receiving maintenance calls. SUMF at ¶ 32.

In August 2013, Ramírez went out on disability leave, becoming unreachable to his team and customers. Id. While he was on leave, his customers met with UBS-PR representatives to discuss outstanding maintenance calls (SUMF at ¶ 33), informing UBS-PR representatives that Ramírez had solicited them to use LOC proceeds to reinvest in additional CEF shares without informing them of the risks associated with doing so. Id. By the end of September 2013, 37 of Ramírez's customers whose loans were recycled, had maintenance calls of over $37 Million. SUMF at ¶ 34.

Subsequently, UBS-PR reviewed Ramírez's clients' accounts (SUMF at ¶ 35), finding, within hours, six of the accounts with potential loan recycling. Id. As part of its internal investigation, UBS-PR engaged National Economic Research Associates, Inc. ("NERA") to assist in identifying the breadths of the potential misuse of the LOCs (SUMF at ¶ 36). NERA's review identified 414 instances where it appeared that CEFs were purchased with proceeds of LOCs

during the period of January 1, 2011-September 13, 2013.  Id.  Of those 414 instances, 230 occurred across 29 unique marketing households in accounts of Ramírez's customers, for a total of $49,506,225.00.  Id.  UBS-PR terminated Ramírez for his use of LOCs to purchase CEFs on behalf of clients in violation of UBS-PR's policy and BUSA's LOC agreement.  SUMF at ¶ 37.

## IV.  DISCUSSION

### A.  Ramírez's Invocation of the Fifth Amendment

Ramírez disputes 35 out of 37 of the SEC's statements of fact on Fifth Amendment grounds (Docket Nos. 30-31), essentially arguing that: (1) he invoked the Fifth Amendment; (2) no adverse inference may be derived from his invocation of the Fifth Amendment at the summary judgment stage; and (3) the SEC has not produced independent admissible evidence of wrongdoing (Docket No. 31 at ¶ 3.11).  The Fifth Amendment privilege against compelled self-incrimination applies in civil and criminal proceedings.  See, Lefkowitz v. Cunningham, 431 U.S. 801, 804-805 (1977)(so recognizing); McCarthy v. Arndstein, 266 U.S. 34, 40 (1924)(same).  Its invocation should not be penalized.  Id.

The privilege operates differently in criminal and civil contexts.  See, Coquina Investments v. TD Bank, N.A., 760 F.3d 1300, 1310 (11th Cir. 2014)(noting difference).  In criminal cases, no negative inference from the accused's silence may be made.  Id.  But in civil cases adverse inferences are permitted against parties, when they refuse to testify in response to probative evidence offered against them.  Id. (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)).  Invocation of the Fifth Amendment is not a substitute for relevant evidence in a civil case excusing a litigant claiming the privilege, from adducing proof in support of a burden which would

otherwise have been his in the litigation.  See, U.S. v. Certain Real Property and Premises known as 4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d 78, 83 (2d Cir. 1995)(examining concept).[19]

With this backdrop, Ramírez's invocation of the Fifth Amendment is insufficient under Fed. R. Civ. P. 56.  He failed to present any evidence to controvert any of the SEC's SUMFs, and albeit argued that in the main, those SUMF's are not supported with admissible, corroborating evidence, as discussed throughout this Opinion, that is not the case.[20]  As the First Circuit stated in In re Marrama, 445 F.3d 518, (1st Cir. 2006), "[w]e draw no inference form Marrama's silence but still see no issue of material fact that precludes summary judgment."  Id. at 523.  Thus, by solely relying on the Fifth Amendment, Ramírez failed to create a genuine issue of material fact. See, S.E.C. v. Ficken, 546 F.3d 45, 52-54 (1st Cir. 2008)(entry of summary judgment in part because defendant, who had invoked the Fifth Amendment, did not raise a genuine issue of material fact in opposing summary judgment); U.S. Commodity Futures Trading Com'n v. Driver, 877 F.Supp.2d 968, 977 (C.D. Cal. 2012)(granting summary judgment against defendant with respect to every question to which he asserted privilege against self-incrimination because plaintiff offered ample evidence to support its claims); S.E.C. v. Benson, 657 F.Supp. 1122, 1129 (S.D. N.Y. 1987)(summary judgment against silent party).

---

[19] When a party in a civil case is confronted with the invocation of the privilege by the opposing side, contrary to the government in a criminal case that party has no capacity to avoid it by, say, offering immunity from prosecution.  See, Mitchell v. U.S., 526 U.S. 314, 328 (1999)(recognizing problem).  Allowing invocation of the privilege though at the risk of suffering an adverse inference -or even a default- for failure to rebut evidence, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed.  Id.  Consequently, the rule does not render assertion of the privilege against self-incrimination unconstitutionally costly.  See, S.E.C. v. Thomas, 116 F.R.D. 230, 234 (D. Utah 1987)(so concluding).  A sanction of precluding a party from introducing evidence for a legitimate assertion of privilege, however, would be too severe and may well "render assertion of the privilege 'costly'."  Id. at 234 & n.6 (citing 8 Wright & Miller, *Federal Practice and Procedure* § 2018 at 148-150 (1970)).

[20] Ramírez basically opted to bypass Local Rule 56(c), which requires a party opposing a motion for summary judgment to submit with its opposition a separate, short, and concise statement of material facts admitting, denying or qualifying the facts supporting the motion for summary judgment, substantiating each denial or qualification by a record citation.  For the most part, he only argued that the SEC had not produced independently admissible evidence of wrongdoing in support of its SUMFs at ¶¶ 2 and 5 (Docket No. 31 at p. 7).

### B. Ramírez's Motion to Strike

First, Ramírez argues that SEC Exhibits 9-11, 14, 16, 18, 19-20, 24, 26, 28-29, 32, 34, and 35 were not attached to an affidavit of the person through whom they could be admitted into evidence, and thus, should be stricken from the record for lack of proper authentication (Docket No. 29 at p. 4). The SEC counters that: (1) the 2010 amendments to the Federal Rules of Civil Procedure do not require a party requesting or opposing summary judgment to authenticate documents, but only to, in case of an objection, demonstrate that they would be presentable in an admissible form at trial (Docket No. 34 at pp. 4-5); and (2) the documents in question are UBS Business Records that: (i) could be presented in an admissible form at trial; (ii) were recorded during the relevant time periods; and (iii) were kept in the course of regularly conducted activity in accordance with regular practice. Id. Furthermore, it points out that a custodian would be able to testify as to these conditions, and there is no indication of a lack of trustworthiness that would justify excluding them at summary judgment. Id. The exhibits will not be excluded.

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that a "party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). The objection the Rule contemplates is "not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." Intern. Shipping Agency, Inc. v. Union de Trabajadores de Muelles Loc. 1740, 2015 WL 5022794, *2 (D.P.R. Aug. 21, 2015)(quoting Foreword Magazine, Inc. v. OverDrive, Inc., 2011 WL 5169384, *2 (W.D. Mich. Oct. 31, 2011); Santos v. Nogueras, 2012 WL 2871108, *4 (D.P.R. July 11, 2012)(that plaintiff could properly authenticate exhibits at trial sufficient to defeat a Rule 56(c)(2) objection). And Ramírez has not explained why the documents would not be admissible at trial. See Intern. Shipping Agency, Inc. 2015 WL 5022794, at *3 ("Because

[plaintiff] makes no argument that the defendants' evidence could not be authenticated, its objection should be denied"); González-Bermúdez v. Abbott Laboratories PR Inc., 214 F.Supp.3d 130, 137 (D.P.R. 2016) (denying general objection to unauthenticated exhibits given that "[a] plain objection simply stating that the exhibit proffered has not been properly authenticated will not suffice").

Second, Ramírez raises a general objection that Exhibits 4, 6, 7, 12-13, 17, 21, 22-23, 25 and 31 contain inadmissible prior testimony because they were rendered in other proceedings and he was unable to cross-examine the witnesses (Docket No. 29 at pp. 5-7).[21] The SEC responds that: (1) considering the amendment to Rule 56, the prior sworn testimony is appropriate because the witnesses could testify at trial, consistently with their prior testimony; and (2) Ramírez had the opportunity to depose the witnesses during the discovery period, but chose not to (Docket No. 34 at p. 8). As support, it cites Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir 1989), for the proposition that "[r]eference to prior trial testimony…is proper in summary judgment cases." Id. Because, in the final analysis, Ramírez could not say that prior sworn testimony rendered in other proceedings is unreliable, the court will not exclude it. See, U.S. v. O'Connell, 890 F.2d 563, 567 (1st Cir. 1989)(concluding that district court properly considered prior criminal trial testimony excerpts in determining there were no genuine issues of material fact, noting that "there is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding…"); Dickinson v. UMass Memorial Medical Group, 2011 WL 1155497, at *8 (D. Mass. Mar. 24, 2011)("Sworn deposition

---

[21] He did not distinguish amongst the types of proceedings wherein the testimony was taken or the type of testimony (deposition, trial, etc.).

testimony may be used to support or oppose a motion for summary judgment regardless of whether the testimony was taken in a prior proceeding").

Third, Ramírez states that the newspaper articles filed as Exhibits 30 and 33 should be stricken for lack of proper authentication and as inadmissible hearsay; and the "economic consulting report" submitted as Exhibit 36 should be stricken due to lack of proper authentication and as an unsworn expert report (Docket No. 29 at pp. 4-5). The SEC explains that Exhibits 30 and 33 are press articles that: (1) are self-authenticating pursuant to Fed. R. Evid. 902(6); (2) would not be used for the truth of the matter asserted, but to demonstrate that articles were published regarding the matters about which witnesses testified; and (3) in any case, would qualify as an exception to hearsay because they have guarantees of trustworthiness and discussed highly publicized events regarding easily verifiable facts (Docket No. 34 at pp. 6-7).

The articles are properly authenticated but do not qualify as an exception to the hearsay exclusion rule, as they do not seem to be "more probative on the point for which [they are] offered than any other evidence…[the SEC] can obtain through reasonable efforts" as required by Fed. R. Evid. 807. Nevertheless, a district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial. See, Securities and Exchange Commission v. Strategic Global Investments, Inc., 262 F.Supp.3d 1007, 1019 (S.D. Cal. 2017)(so noting)(citing in part, JL Beverage Company, LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1110 (9th Cir. 2016) and Fed. R. Civ. P. 56(c)(2) committee's note to 2010 amendments). Such is the case here.

Exhibit 30 was submitted to support the SEC's SUMF at ¶ 29, which states that in 2013, the Puerto Rico bond market collapsed when the major credit rating agencies began a series of downgrades resulting in Puerto Rico's credit rating being lowered to just above "junk" status, a

statement supported by additional material in the record.  See, Exhibits 3, 12, 17, and 25.  Exhibit 33 was used in connection with the statement at SUMF at ¶ 30, to the effect that from "January through September 2013, the CEFs lost over $1.6 billion in market value."  Other exhibits refer to the collapse of the market and resulting losses, which totaled 20-30% of market capitalization. See, Exhibit 3 (Docket No. 22-4 at pp. 99-106).

Fourth, Ramírez claims Exhibit 36 should be stricken as an "unsworn expert witness report" (Docket No. 29 at p. 5).  The SEC maintains that: (1) Exhibit 36 it is not an "expert witness report" but a "summary statistical report"; (2) the methodologies used to arrive at the statistical conclusions could be testified at trial; and (3) according to Fed. R. Evid. 1006, it is permissible to use a summary or calculation to prove the content of voluminous materials as long as the originals or duplicates are available for examination by the other party (Docket No. 34 at pp. 6-7).[22]  The court agrees with the SEC that the conditions for admissibility under Rule 1006 have been satisfied. Therefore, the exhibit will not be stricken.

## C.  SEC's claims

The SEC contends that Ramírez engaged in a fraudulent scheme: (i) making material omissions and misrepresentations; (ii) in the offer or sale of securities (in the context of the Securities Act) and in the purchase or sale of securities (in the context of the Exchange Act); (iii) acting with scienter; (iv) in interstate commerce (Docket No. 21).  Ramírez responds that there is no basis for the SEC's claim because it relies on factual assertions for which there is no record support inasmuch as: (1) he invoked the Fifth Amendment; and (2) the documents that the SEC submitted to back up the claim must be stricken (Docket No. 31 at pp. 1, 3).

---

[22] Further, the SEC asserts that the underlying supporting evidence of the report was all produced as part of discovery.  Id. at p. 7.

Ramírez's arguments were discussed and rejected above. As for the merits, Section 17(a) makes it unlawful to engage in certain conduct "directly or indirectly" in "the offer or sale of securities." 17 U.S.C. § 77q(a). Section 17(a)(1) bars "employ[ing] any device, scheme, or artifice to defraud." Id. Section 17(a)(2), forbids "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact." Id. Section 17(a)(3) proscribes "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." Id. Section 10(b) of the Exchange Act makes it unlawful to, in connection with the purchase or sale of securities, "use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b).

Pursuant to this rulemaking power, the SEC promulgated Rule 10(b)-5, which renders it illegal to "employ any device, scheme or artifice to defraud; (b) make any untrue statement or omission of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. The scope of Rule 10(b)-5 is coextensive with the coverage of Section 10(b). See, SEC v. Zandford, 535 U.S. 813, 816 & n.1 (2002)(so recognizing).

The Securities Act and the Exchange Act were enacted to set the economy on the road to recovery after the 1929 stock market crash and reports of widespread abuses in the securities industry. See, Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 78 (2006) (describing historical background of Securities Act and Exchange Act); Central Bank of Denver,

N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 170-171 (1994)(same). They seek to promote this goal by prohibiting fraud through an extensive scheme of civil and criminal liability, substituting a philosophy of full disclosure for the philosophy of caveat emptor, thus setting a high standard of business ethics in every facet of that industry. See, U.S. v. Naftalin, 441 U.S. 768, 775 (1979)(noting statutory objectives); Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963) (same). Since their enactment, they "have anchored federal regulation of vital elements of our economy." Dabit, 547 U.S. at 78.

Consistently with their objective, the statutes contain catch-all language designed to prevent fraudulent practices, including not just garden type varieties of fraud, but also unique forms of deception involving novel or atypical methods. See, VanCook v. S.E.C., 653 F.3d 130, 138 (2nd Cir. 2011)(so observing)(quoting Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 11 & n.7 (1971). In their operation, their elements coincide. To that extent, the elements of a Section 17(a) claim are virtually identical to those of a Section 10(b) and Rule 10(b)-5 claim, except that scienter is not necessary to show a violation of Sections 17(a)(2) and 17 (a)(3). See, S.E.C. v. Druffner, 517 F.Supp.2d 502, 508 (D.Mass. 2007), aff'd S.E.C. v. Ficken, 546 F.3d 45 (1st Cir. 2008)(noting similarity); S.E.C. v. Wolfson, 539 F.3d 1249, 1256 (10th Cir. 2008)(observing that Section 17(a) requires substantially similar proof as Section 10(b) and Rule 10(b)-5).[23]

---

[23] The SEC grouped its discussion of the Securities Act and the Exchange Act, instead of addressing the elements for each claim separately or attempting to be more precise in its discussion of the specific elements for each cause of action. The SEC's approach did not result in any argumentative deficiency, as courts have regularly considered the same misconduct as violative of Section 17(a), Section 10(b) and Rule 10(b-5. See, S.E.C. v. Rocklage, 470 F.3d 1, 14 & n.1 (1st Cir. 2006)(all parties agreed that analysis under Section 17(a) is identical to analysis under Section 10(b) and Rule 10(b)-5); U.S.S.E.C. v. Power, 525 F.Supp.2d 415, 419-423 (S.D. N.Y. 2007)(common factual allegations underlying infringement of 0the three provisions).

### (1)  Fraudulent Scheme/Course of Conduct

Scheme liability "arises where the defendant employs a deceptive device for the purpose of defrauding investors."  See, Securities and Exchange Commission v. Esposito, 2017 WL 388800, at *6 (D. Mass. Jan. 27, 2017)((citing S.E.C. v. Durgarian, 477 F.Supp.2d 342, 351-352 (D. Mass. 2007), aff'd, S.E.C. v. Papa, 555 F.3d 31 (1st Cir. 2009)).  Ramírez employed a fraudulent scheme to have customers invest in CEFs with money drawn from their LOCs, concealing that the practice was in contravention of UBS-PR policy and prohibited by the LOC agreements.  Docket No. 21, pp. 14-15; SUMFs at ¶¶ 10, 15, 16, 19.  He directed his customers to request wire transfers or write checks from their LOCs to the customers' personal bank accounts at other banks, SUMFs at ¶¶ 17, 22, and afterwards, to deposit the funds recently deposited into their outside bank, into their UBS-PR brokerage accounts so that Ramírez could execute trades for additional CEF shares (id.), while Ramírez attempted to shroud his strategy in legitimacy saying "if I give you this dollar and you bring [another dollar] back next month, it's not the same dollar," thus implying that the strategy was not a violation of the LOC agreement or of UBS-PR policy. SUMFs at ¶¶ 20, 25.

### (a) Material omissions and misrepresentations

While recommending that strategy to clients, Ramírez omitted explaining that if the value of the collateral decreased below a certain level, the customer could receive a maintenance call, and the firm could liquidate the customer's investments in order to satisfy the outstanding maintenance call.  SUMF at ¶ 13.  The "it's not the same dollar" line falls under the same category, for it implied that the strategy did not violate the LOC agreement and UBS-PR policy, SUMFs at ¶¶ 20, 25.  So too, informing customers that there was little or no risk in using proceeds from their LOCs to reinvest in additional CEF shares because the CEFs "were guaranteed by the Constitution

of Puerto Rico" and "Plaza las Americas will go broke before something happens [to your money]." SUMFs at ¶¶ 24 and 25. Thus, even though investing in CEFs had risks, such as the lack of liquidity, Ramírez did not explain those risks (SUMFs at ¶ 5), to the point where, some clients even believed that the CEFs were bonds. SUMF at ¶ 6.

The misrepresentations and omissions were material. A "misrepresentation is material if there is a substantial likelihood that the misrepresentation would affect the behavior of a reasonable investor." Ficken, 546 F.3d at 47 (so recognizing); S.E.C. v. Fife, 311 F.3d 1, 10 (1st Cir. 2002)("misrepresentations and omissions were material because a reasonable investor would want to know the risks involved"). Such was the case here, as investors would have wanted to know the risks involved in the recommended strategy, including the risk of loss of principal, and the risk of maintenance calls in the event the value of LOC collateral decreased (Docket No. 21 at p. 14). Even more, investors would have been interested in knowing that Ramírez's recommendations were in direct contravention of UBS-PR policy and of the LOC agreements. And along the same line, those disclosures would have significantly altered the "total mix" of information made available to them. See, Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988) (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) ("to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available'").[24] No reasonable minds could differ on the question of materiality. See, TCS

---

[24] The SEC submitted testimony of two investors who would not have invested in CEFs using LOC proceeds had they known the risks involved in Ramírez's strategy. SUMF at ¶ 25.

<u>Indus</u>. v. <u>Northway, Inc.</u>, 426 U.S. 438, 450 (1976)(applying formulation in summary judgment context)

### (b) In the Offer or Sale of Securities (for purposes of the Securities Act); In connection with the purchase or sale of securities (for purposes of the Exchange Act)

For purposes of the Securities Act, the material omissions and misrepresentations must have been "in the offer or sale of any securities," whereas for purposes of the Exchange Act, they must have been "in connection with the purchase or sale of any securities." 15 U.S.C. § 77q; 17 C.F.R. § 240.10b-5. The Supreme Court has directed lower courts to interpret those requirements broadly and flexibly rather than technically or restrictively. <u>See</u>, <u>Naftalin</u>, 441 U.S. at 773 (so holding under Securities Act); <u>S.E.C.</u> v. <u>Zandford</u>, 535 U.S. 813, 819 (2002)(same as to Exchange Act and Rule 10(b)-5). It has used Section 17(a)'s phrase "in" interchangeably with Section 10(b)'s "in connection with," <u>Naftalin</u>, 441 U.S. at 773 & n.4 (so stating), further noting that the statutory terms are expansive enough to "encompass the entire selling process, including the seller/agent transaction." <u>Id</u>. at 773. To this end, the terms cover Ramírez's scheme and misrepresentations, directed, as they were, to investors in order to encourage them to purchase additional CEF shares with LOC proceeds (Docket No. 21 at p. 16; SUMF at ¶¶ 15, 17, and 22). <u>See</u> <u>Calderon Serra</u> v. <u>Banco Santander Puerto Rico</u>, 747 F.3d 1, 6 (1st Cir. 2014)(holding that allegations of fraudulently misrepresenting or failing to disclose Regulation U margin lending restrictions as part of a scheme to induce customers to purchase more securities was "in connection with the purchase or sale" of a security under Rule 10b-5); <u>Wolfson</u>, 539 F.3d at 1262-1263 (material misstatement or omission present "in the offer or sale" of securities and "in connection with the purchase or sale" of a security).

### (c) Scienter

As explained above, violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require proof of scienter.[25]  Negligence, however, is sufficient to establish liability under Sections 17(a)(2) and 17(a)(3).  See, Ficker, 546 F.3d at 47 (so noting).  Scienter consists of a mental state embracing intent to deceive, manipulate, or defraud.  Id. (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)).  It calls for a showing of either conscious intent to defraud or a high degree of recklessness (id.), and may be demonstrated by indirect evidence.  See, In re Cabletron Systems, Inc., 311 F.3d at 38 (discussing issue); Druffner, 517 F.Supp.2d at 509 (same).

Recklessness refers to a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.  See, Ficken, 546 F.3d at 47-48 (so noting)(quoting S.E.C. v. Fife, 311 F.3d at 9-10) (internal quotations omitted).  While it is unusual to grant summary judgment on scienter, it is appropriate where the movant has presented evidence sufficient to establish the elements of the action and the nonmoving party fails to submit sufficiently probative evidence or to controvert the record, resting "upon conclusory allegations, improbable inferences, and unsupported speculation."  Id. at 51 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

First, Ramírez knew that UBS-PR's policies and the LOC agreements prohibited the practice of transacting CEF's with LOC proceeds (SUMF at ¶ 10), but put in place a scheme to

---

[25] See also, Aaron v. Securities and Exchange Commission, 446 U.S. 680, 691, 695-697, 701-702 (1980)(analyzing scienter requirement under Sections 17(a)(1), 17(a)(2), 17(a)(3) and 10(b), and Rule 10(b)-5).

avoid detection, persuading customers to request wire transfers or write checks from their LOC's

to the customers' personal bank accounts at other banks (SUMFs at ¶¶ 17, 22), and to deposit the

funds into their UBS-PR brokerage accounts so Ramírez could execute trades for CEF shares.  Id.

He encouraged customers using the "it's not the same dollar" line, implying that his recommended

strategy was not a violation of the LOC agreement or UBS-PR policy.  SUMFs at ¶¶ 20, 25.  As

an experienced registered representative, however, he either knew or was reckless in not knowing,

that his recommendations about the safety of the CEFs and his proposed strategy were misleading.

Second, Ramírez was at least reckless in: (1) failing to explain to customers that if the value

of their collateral decreased below a certain level, they could receive a maintenance call and lose

their investments in a firm-initiated liquidation procedure (SUMF at ¶ 13); (2) telling customers

that there was little or no risk in using proceeds from their LOCs to reinvest in additional CEF

shares because the CEFs "were guaranteed by the Constitution of Puerto Rico" and "Plaza las

Americas will go broke before something happens [to your money]," (SUMFs at ¶¶ 24 and 25);

and (3) failing to explain other general risks about investing in CEFs, such as the lack of liquidity,

to the point that, as noted above, some clients believed that CEFs were bonds (SUMFs at ¶¶ 5 and

6).

Third, topping it all, Ramírez earned commissions on the CEFs that his customers

purchased (SUMF at ¶ 28), a fact demonstrative of a financial motive to incur in material omissions

and misrepresentations.  See, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325

(2007) (personal financial gain may weigh heavily in favor of inferring scienter).[26]  He acted with

---

[26] Relying on United States v. Zanghi, 189 F.3d 71, 83 (1st Cir. 1999), the SEC suggests that Ramírez's disability leave of absence shows a guilty conscience (Docket No. 21 at p. 12).  Zanghi supports this proposition "so long as there is an adequate factual predicate for the inference that the defendant's movement was indicative of a guilty conscience."  As of today, the record does not contain a sufficient, additionally independent "factual predicate" to support the SEC's contention that Ramírez went on leave due to a guilty conscience instead of some other reason.

the requisite scienter.  See, Ficken, 546 F.3d at 51 (no genuine dispute regarding scienter); S.E.C.

v. Smith, 2015 WL 4067095, at *7 (D.N.H. July 2, 2015)(summary judgment for SEC).

### (d) Interstate Commerce

Finally, Ramírez communicated with possible customers/investors by telephone, among

other methods, to carry out the scheme (SUMF at ¶ 14), confirming use of interstate commerce.

(Docket No. 21 at p. 15-16).

## V.      CONCLUSION

The SEC has established all the necessary elements to show that Ramírez violated Section

17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  In view

of the foregoing, "Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability and

Accompanying Memorandum of Law" (Docket No. 21) is GRANTED.  Ramírez's "Motion to

Strike" (Docket No. 29) is DENIED.

At footnote 1 of its motion, the SEC points out that if the motion is granted, it will attempt

to resolve with Ramírez "the remaining issues as to the relief it seeks, namely injunctive relief,

disgorgement plus prejudgment interest, and civil penalty," and in the event it is unable to do so,

it will file the appropriate motion in court (Docket No. 21 at n.1).  To that end, it requests 90 days

to move for the additional remedies in case it is unable to reach an agreement.  It may so move by

June 15, 2018.  On May 25, 2018, the parties shall file a follow up joint informative motion on the

status of the case.

**SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of April, 2018.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge