**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>**JOSÉ G. RAMÍREZ, JR.**<br><br>    **Defendant.** | **CIVIL NO. 15-2365 (PAD)** |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

The Securities and Exchange Commission ("SEC") sued José G. Ramírez, Jr., formerly a registered representative of UBS Financial Services Inc. of Puerto Rico ("UBS-PR"), for violating federal securities laws (Docket No. 1). Earlier in the litigation, the court entered summary judgment against Ramírez, finding him liable of violating those provisions (Docket No. 39). The SEC now moves for a final judgment imposing permanent injunctive relief, disgorgement, and prejudgment interest (Docket No. 82).[1]  For the reasons that follow, the SEC's motion is GRANTED. Therefore, in addition to being hereby permanently enjoined from violating federal securities laws, Ramírez shall pay $1,520,576.29 in disgorgement and $265,310.36 in prejudgment interest to the SEC.

## I.    BACKGROUND

On September 29, 2015, the SEC initiated this enforcement action against Ramírez for violating Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a)(1), (2), and (3), Section 10(b) of the Securities Exchange Act of 1934 (the

---

[1] Disgorgement is a form of restitution measured by the defendant's wrongful gain.

"Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a), (b), and (c) thereunder, 17 C.F.R. §§

240.10b-5(a), (b), and (c), by way of a fraudulent scheme involving loan recycling to purchase and

sell approximately $50 million in Closed-End Funds ("CEFs") (Docket No. 1).[2]  Ramírez answered

the Complaint, invoking his right against self-incrimination, admitting some allegations while

denying others, and raising a number of affirmative defenses (Docket No. 8).

On March 1, 2017, the SEC moved for partial summary judgment on the issue of liability

(Docket Nos. 21 and 22), which Ramírez opposed (Docket Nos. 29, 30, and 31).  The SEC replied

(Docket No. 34).  On April 6, 2018, the court granted the SEC's motion (Docket No. 37), and on

April 30, 2018, issued an Opinion and Order explaining the grounds for its ruling (Docket No. 39).

In light of related developments, however, it stayed proceedings, ordering the parties to file follow-

up informative motions on the status of the case (Docket Nos. 39 and 68).[3]

On April 10, 2019, the SEC asked the court to reopen the case (Docket No. 76).  The court

did so (Docket No. 77).  The SEC then moved for final judgment (Docket No. 78), which the court

granted (Docket No. 79), but at the parties' request (Docket No. 80), vacated the order and

---

[2] As described in the Complaint, CEFs are closed-end investment companies incorporated under the laws of Puerto Rico, available only to residents of Puerto Rico (Docket No. 39, p. 3 n. 5).  They are not registered in the SEC, are not traded on any exchange or quoted on any quotation service, and are non-marginable and significantly leveraged, financing approximately 50% of their total assets, thus bearing the concomitant risk level.  Nearly all of them invest in similar securities, with investment portfolios generally concentrated in Puerto Rico municipal bonds, which produce tax-free interest income. Dividend payments to residents of Puerto Rico are tax-exempt. To be eligible for tax benefits, the CEF portfolios must be comprised of at least 67% Puerto Rico issuers. Although CEFs have a high percentage of their portfolios in Puerto Rico bonds, they are not fixed-income securities. Payable dividends vary depending on a number of factors, including prevailing margin loan rates payable by the particular CEF, interest rates, market value of securities within CEFs and various fees and expenses. In response to this description, Ramírez invoked his constitutional right against self-incrimination. Id.

[3] The parties complied, filing periodic reports (Docket Nos. 40, 44, 52, 57, 61, 65, 70, 73, 75).  Meanwhile, Ramírez was indicted- United States v. José G. Ramírez-Arone, Jr., 18-325 (TFH)(D.D.C.) – and pled guilty to bank fraud in violation of 18 U.S.C. § 1344(1) and (2).  He was sentenced to 12 months and 1 day of imprisonment, followed by two years of supervised release (Docket No. 75).

corresponding judgment (Docket No. 81).  Now, the SEC reiterates the request for final judgment

(Docket No. 82).

## II.     DISCUSSION

### A.  Permanent Injunctive Relief

The SEC asks for permanent injunctive relief against Ramírez because in its view, he is

likely to commit future violations of the securities laws, particularly, of Sections 17(a)(1)-(3) of

the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder (Docket Nos. 1,

48 and 82).  Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b) and Section 21(d)(1) of the

Exchange Act, 15 U.S.C. § 78u(d)(1), authorize the SEC to obtain injunctive relief to prevent

"further violations of … federal securities laws."  S.E.C. v. Esposito, 2018 WL 2012688 *1, *10

(D. Mass. April 30, 2018).  Courts have broad authority to grant such relief when there is "a

reasonable likelihood that the defendant will again violate those laws."  S.E.C. v. Tropikgadget

FZE, 2017 WL 722573, *4 (D. Mass. Feb. 23, 2017).

The evidence is examined in the light most favorable to the SEC, which "is entitled to the

benefit of all reasonable inferences."  S.E.C. v. Blatt, 583 F.2d 1325, 1328 (5th Cir. 1978).

Reasonable likelihood of future violations is measured by whether: (1) a defendant's violation was

isolated or part of a pattern; (2) the violation was flagrant and deliberate or merely technical in

nature; and (3) the defendant's business will present opportunities to violate the law in the future.

See, S.E.C. v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)(addressing topic).  Viewing the record

as a whole, permanent injunctive relief is warranted.[4]

While in UBS-PR, Ramírez violated securities laws in an elaborate and deliberate scheme

---

[4] The factual predicate for the court's conclusion is taken from the Opinion and Order finding Ramírez liable (Docket No. 39) and other materials in the record.  The factual findings made at Docket No. 39 are therefore incorporated by reference.

involving millions of dollars that spanned several years, until it crashed with the collapse of the

Puerto Rico bond market. UBS-PR's policies and Line of Credit ("LOC") agreements prohibited

transacting CEFs with LOC proceeds (Docket No. 39, p. 6), but Ramírez put in place a plan to

circumvent them, directing customers to request wire transfers or write checks from their LOCs to

the customers' personal bank accounts in other banks (Docket No. 39, p. 6).[5] Afterwards, they

were instructed to deposit the funds recently deposited in their outside bank accounts into their

UPS-PR brokerage accounts, to allow Ramírez to execute trades for additional CEF shares. Id.

In this way, the scheme misused LOCs by drawing funds from them to purchase securities,

directly violating UBS-PR policy and the credit lines' terms of use, taking advantage of the LOC's

low interest rates and the payout interest rate of CEF's, which had a high percentage of their

portfolios in Puerto Rico bonds.[6] The scheme avoided detection because UBS-PR did not have in

place a procedure designed to catch transfers from LOCs to outside banks or from outside banks

back to UBS-PR (Docket No. 39, p. 6).

Despite Ramírez' knowledge that his conduct caused submission of falsified credit

applications, he did not desist. Instead, he went on, misrepresenting to customers that there was

no violation of UBS-PR policy as long as the proceeds were first transferred to an outside bank

account (Docket No. 39, p. 6). To that end, in several meetings with customers, he would take a

dollar bill out of his wallet and say "if I give you this dollar and you bring [another dollar] back

next month, it's not the same dollar." Id. at pp. 6-7. Further, he told some customers "Plaza Las

---

[5] UBS-PR offered its customers non-purpose LOCs from a Utah-based affiliate, UBS Bank USA at no initial cost to the customer, with a low interest rate (Docket No. 39, p. 4). The loan agreements and UBS-PR's internal policy, however, prohibited the use of LOC proceeds to purchase, carry, or trade in securities. Id.

[6] Customers could borrow money through the LOC at rates as low as 1.5 percent, whereas the CEFs generated returns of greater than 6 percent (Docket No. 39, p. 6).

Américas will go broke before something happens [to your money];"[7] he stated that there was little or no risk in using proceeds from their LOCs to reinvest in additional shares of the CEFs; and he falsely claimed that investments in the CEFs were guaranteed by the Constitution of Puerto Rico. Id. at p. 7.

Ramírez enriched himself through this fraudulent scheme all the while exposing his customers to serious risk. His compensation was based in part on his LOC production and the amount of funds that his customers withdrew upon their LOCs, generating commissions on both ends of the arrangement (Docket No. 39, pp. 7-8). From 2011 to 2013, he received over $12.9 million in total compensation, over $5.5 million of which was attributable to customer LOCs. Id. at p. 8. It all ended in 2013, with the collapse of the Puerto Rico bond market.[8]

The erosion in the Puerto Rico bond prices hit CEF investors particularly hard, because the CEFs employed leverage of up to 50 percent of the total CEF assets, losing 20-30% of market capitalization. Id. And what followed came as no surprise: customers with LOCs collateralized by brokerage accounts holding CEFs began receiving maintenance calls to put up more margin in order to support their credit lines, as that money had been used to purchase shares in CEFs with a high percentage of Puerto Rico bonds, and with the crash, the margin was insufficient to maintain the lines. Id.[9] By the end of September 2013, 37 of Ramírez's customers with recycled loans had

---

[7] Plaza Las Américas is a well-known shopping center located in San Juan, Puerto Rico (Docket No. 39, p. 7 n.16).

[8] The Puerto Rico bond market collapsed when, among other things, major credit ratings agencies began a series of downgrades of Puerto Rico's credit rating (Docket No. 39, p. 8).

[9] UBS-PR and UBS-USA operated a "haircut engine," which contained the value of the collateral and the outstanding balance of the LOC account (Docket No. 39, p. 7 n. 17). If the value fell below a certain threshold determined by the engine, the customers received a maintenance call requiring them to increase the collateral, pay down the loan by a certain amount, or risk UBS' liquidating collateral. Id. As the CEFs were not marginable, customers could not use them to obtain margin loans. Id.

maintenance calls for over $37 Million.  Id.

Ramírez perpetrated the loan-recycling fraud from as early as 2008 through 2013 (Docket No. 22-9).  From January 2011 through September of 2013, there were 414 instances where it appeared that CEFs were purchased with proceeds from customer's LOCs (Docket No. 39, pp. 8-9).  Ramírez's customers, representing 29 separate households, accounted for 230 of these purchases, for a total of $49,506,225.00.  Id. at p. 9.  As mentioned earlier, the scheme only ended with the crash of the Puerto Rico bond market, which deeply depressed the value of the CEFs.  With the collapse, Ramírez became unreachable to his team and customers.  Id. at p. 8.[10] Nevertheless, his customers were able to meet with UBS-PR representatives to discuss the maintenance calls, and informed those representatives that Ramírez had encouraged the customers to loan recycle without informing them of the risks of doing so.  Id.

As an experienced registered representative - he had been in UBS since 1997 (Docket No. 22-21, pp. 22-23) - Ramírez either knew or was reckless in not knowing that his recommendations about the safety of the CEFs and his proposed strategy were, to put it mildly, misleading.  He acted with, to say the least, a high degree of recklessness.  His conduct departed in the extreme from the ordinary standard of care in misrepresenting to customers that there was no violation of UBS-PR policy as long as the proceeds were first transferred to an outside bank account; in failing to explain to customers that if the value of their collateral decreased below a certain level, they could receive a maintenance call and lose their investments in a firm-initiated liquidation procedure; telling customers that there was little or no risk in using proceeds from their LOCs to reinvest in additional CEF shares because the CEFs "were guaranteed by the Constitution of Puerto Rico" and "Plaza

_____
[10] Ramírez went out on disability leave (Docket No. 39, p. 8).

Las Américas will go broke before something happens [to your money];" and failing to explain to customers other general risks about investing in CEFs, such as the lack of liquidity, to the point that some clients erroneously believed that CEFs were bonds (Docket No. 39, p. 21). Furthermore, he misrepresented to UBS-PR that he had disclosed material information concerning risks to customers. Id. at p. 7.

From any reasonable view of the events, what Ramírez devised and perpetrated was not an isolated or sporadic incident but part of a pattern, one extending over a number of years, with multiple customers and millions of dollars of loan recycling. The scheme was flagrant, and Ramírez' conduct outrageous, elements that justify entry of injunctive relief prohibiting future violations of securities laws. See, Blatt, 583 F.2d at 1334-1335 (5th Cir. 1978)(nature and extent of securities violations warranted permanent injunction against the apparent mastermind of the violations); S.E.C. v. Druffner, 517 F.Supp.2d 502, 513 (D. Mass. 2007)(permanent injunction in case of a pattern of flagrant and deliberate violations as part of which the defendant, "motivated by the prospect of financial gain, engaged in fraudulent activities over an extended period of time").

Ramírez argues that because he is a convicted felon and the Financial Industry Regulatory Authority ("FINRA") permanently barred him from working in the industry, he is unlikely to incur in future violations (Docket No. 86, p. 2). Cessation of illegal activity "does not *ipso facto* justify the denial of an injunction." S.E.C. v. Management Dynamics, Inc., 515 F.2d 801, 807 (2nd Cir. 1975). Along with its power to hear the case, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." S.E.C. v. Culpepper, 270 F.2d 241, 250 (2d Cir. 1959). By the same token, changing jobs "in and of itself, or in combination with cessation of illegal activities" does not necessarily defeat injunctive relief. S.E.C. v. Koracorp. Indus., 575 F.2d 692,

698 (9th Cir. 1978), *cert. denied* 439 U.S. 953 (1978).  In the mix, the "commission of past illegal conduct is highly suggestive of the likelihood of future violations." Management Dynamics, 515 F.2d at 807.  That is so even when a defendant "ceased [his] illegal activities prior to the commencement of the action." S.E.C. v. Keller Corp., 323 F.2d 397, 402 (7th Cir. 1963).[11]  First offenders "are not immune from injunctive relief." S.E.C. v. Shapiro, 494 F.2d 1301, 1308 (2d Cir. 1974).

Despite these strong considerations, Ramírez has not presented any evidence to alleviate the SEC's concern of future violations.  The gravity of the harm that he inflicted is evident, extensive, and extreme.  He directly and knowingly orchestrated, participated, executed, and benefitted from a fraudulent scheme.  He was its mastermind and driving force, with the scienter to obtain the results he expected, and eventually obtained.[12]  He continually misrepresented to his customers that the purported transactions did not violate UBS-PR's policy or the LOC agreements, while generating millions in personal income.  Customers only learned of the scheme when they began receiving maintenance phone calls.  The only deterrent for Ramírez's conduct was the crash in the Puerto Rico bond market –an external event– not a personal decision, which forced him to stop, in an abrupt manner, the continuation of the scheme.  There is no sincere disavowing from him to elude similar activities in the future.  He deviously manipulated the rules for years.  Nothing prevents him from doing it again, behind the façade of an accomplice.

---

[11] See, S.E.C. v. Universal Major Industries, 546 F.2d 1044, 1048 (2d Cir. 1976)(permanent injunction despite appellant's contention that he had ceased his association with a codefendant over three years earlier and the SEC had not suspected him of illegal activity since that time).

[12] Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." S.E.C. v. Fife, 311 F.3d 1, 9 (1st Cir. 2002)(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 n.12 (1976)).  It calls upon the plaintiff to demonstrate that the defendant acted with a high degree of recklessness or consciously intended to defraud. Id. Recklessness is a highly unreasonable omission, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it. Id.

All things considered, a permanent injunction is appropriate to enjoin Ramírez from again incurring in the proscribed conduct. See, S.E.C. v. Manor Nursing, 458 F.2d 1082, 1100-1101 (2d Cir. 1972)(permanent injunction against defendants who engaged in blatant and often completely outrageous violations, did not attempt to cease or undo the effects of their unlawful activity until the institution of an investigation, and did not provide sincere assurances that they would not again violate federal securities laws). In consequence, the SEC's request for permanent injunctive relief is GRANTED.

## B. Disgorgement

The SEC requests $1,520,576.29 in disgorgement (Docket No. 82). Generally, "disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Kokesh v. S.E.C., 137 S.Ct. 1635, 1640 (2017)(citing, Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment *a,* p. 204 (2010)). Its purpose is "to prevent unjust enrichment and to make securities law violations unprofitable." S.E.C. v. Platforms Wireless, 617 F.3d 1072, 1097 (9th Cir. 2010). Its application requires that the defendant give up "those gains ... properly attributable to the defendant's interference with the claimant's legally protected rights." Kokesh, 137 S.Ct. at 1640. The court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-1475 (2d Cir. 1996).

The amount need not be an exact number but "a reasonable approximation of profits casually connected to the violation." S.E.C. v. Happ, 392 F.3d 12, 31 (1st Cir. 2004)(so stating); Esposito, 2018 WL 2012688, *8 (D.Mass. April 30, 2018)(same). "[T]he amount of disgorgement should include all gains flowing from the illegal activities." S.E.C. v. JT Wallenbrock & Assocs., 440 F.3d 1109, 1113-14 (9th Cir. 2006). Doubts are to be resolved against the defrauding party.

See, Happ, 392 F.3d at 31 (quoting S.E.C. v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983)). So, the risk of uncertainty in calculating disgorgement falls on the wrongdoer whose illegal conduct created the uncertainty. Id. Once a reasonable approximation is established, the burden shifts to the defendant to demonstrate that the disgorgement figure is not a reasonable approximation. Id.

The SEC relies on findings set in the Report of National Economic Research Associates ("NERA"), which includes a potential loan recycling of over 400 transactions in a 60-day period, yielding $1,520,576.29 (Docket No. 82-1). In a Declaration, Mr. Mark Dee, accountant for the SEC, specifically describes the methodology used and the calculation reached (Docket No. 82-1).[13] Ramírez' main objection centers on the 60-day period that the SEC's expert used to calculate the algorithm for the recycling scheme, arguing that the facts do not support the methodology used (Docket No. 86). He claims that the NERA report's findings are unreasonable and not casually connected to the loan recycling scheme, and therefore, excessive and unreliable (Docket No. 86, pp. 4-6).

Because the risk of uncertainty in calculations involving disgorgement fall on the wrongdoer, in this case Ramírez, the court finds that no persuasive proffer has been made to contradict the SEC's methodology and results.[14] On this account, the sum of $1,520,576.29 is

---

[13] In his Declaration, Mr. Dee states: "To calculate Mr. Ramirez's transaction-based compensation attributable to the fraudulent conduct found in the Order, I used the figures from the NERA Report, which analyzed CEF transactions between 2011-2013, which is precisely the timeframe I am using for purposes of the calculations herein. In its report, NERA identified 230 instances where a Ramirez customer purchased CEFs attributable to Ramirez's fraudulent conduct. These purchases occurred across 29 unique marketing households in accounts of Ramirez's clients for a total of $49,506,225.38 between 2011 and 2013" (Docket No. 82-1, pp. 13-14).

[14] In Tropikgadget, 2017 WL 722573, the SEC consulted with a forensic accountant, who calculated defendant's profits from the scheme by reviewing his bank account statements and the underlying transactions from November 2013 to July 2014. The Court found that the disgorgement amount and prejudgment interest requested by the SEC was reasonable. The same conclusion was reached in Esposito, where the Court found that the reasonably approximated profits were causally connected to the illegal conduct alleged in the complaint and found no error in the SEC's forensic accountant's calculations. See, 2018 WL 2012688 at *8.

reasonably related to the transaction-based compensation directly attributed to Ramírez. As such, the SEC's disgorgement request for $1,520,576.29 is GRANTED.

## C. **Prejudgment Interest**

The SEC asks for an award of prejudgment interest in the amount of $265,310.36 (Docket No. 82). Prejudgment interest "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." S.E.C. v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003). As with disgorgement, the decision of whether to impose prejudgment interest is relayed by the court's discretion. Id. The SEC calculated the prejudgment interest on the disgorgement amount relying on the Internal Revenue Service's formula described in 26 U.S.C. § 6621(a)(2) (Docket No. 82).[15] Further, the calculations reflect interest from the date the Complaint was filed up to the date that the Opinion and Order adjudicating the issue of liability was entered (Docket No. 82, p. 17). The methodology used is consonant with the applicable regulatory provisions. On that basis, the request for prejudgment interest in the amount of $265,310.36 is GRANTED.

## D. **Civil Penalty**

The SEC moves for voluntary dismissal of civil penalty (Docket No. 82). Ramírez does not oppose the request. (Docket No. 86). Therefore, the request for civil penalty is DISMISSED.

---

[15] See, SEC Rules and Regulations, 60 Fed.Reg. 32,738, 32,788 (June 23, 1995)(codified at 17 C.F.R. § 201.600(b))("The S.E.C. has adopted the tax underpayment rate for prejudgment interest on orders of disgorgement in all administrative proceedings"); Platforms Wireless Int'l Corp., 617 F.3d at 1099 (district court did not abuse its discretion by calculating prejudgment interest based on § 6621(a)(2)); Druffner, 517 F.Supp.2d at 512-513 (relying on Section 6621(a)(2)).

### III.   CONCLUSION

For the reasons stated, the SEC's motion for entry of judgment imposing permanent injunctive relief, disgorgement, and prejudgment interest is GRANTED, without imposition of civil penalty for relief.  Judgment shall be entered accordingly, detailing the items to be covered by it with required specificity.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2020.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge